

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-15-00364-CR

Joe William **MEURET** Jr.,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 229th Judicial District Court, Duval County, Texas
Trial Court No. 14-CRD-07
Honorable Ana Lisa Garza, Judge Presiding

Opinion by:  Patricia O. Alvarez, Justice

Sitting:  Sandee Bryan Marion, Chief Justice
Karen Angelini, Justice
Patricia O. Alvarez, Justice

Delivered and Filed:  July 20, 2016

AFFIRMED

Appellant Joe William Meuret Jr. was indicted for sexual assault against A.T., an adult

with diminished mental capacity, and Meuret entered a plea of not guilty.  A jury convicted

Meuret[1] of sexual assault under section 22.011(a)(1)(A) of the Texas Penal Code.  *See* TEX. PENAL

CODE ANN. § 22.011(a)(1)(A) (West 2011).  The jury assessed punishment at sixteen-years'

confinement in the Institutional Division of the Texas Department of Criminal Justice and assessed

---

[1] Although the record includes several spellings of Appellant's last name, the judgment identifies Appellant as Joe
William Meuret Jr.  Accordingly, we have used "Meuret" to identify Appellant throughout this opinion.

a $5,000.00 fine.  On appeal, Meuret argues the State failed to prove beyond a reasonable doubt the element of non-consent as that term is defined in Texas Penal Code section 22.011(b)(4).  *Id*. § 22.011(b)(4).  Alternatively, Meuret challenges section 22.011(b)(4) as unconstitutionally vague and a violation of his due process rights.  We affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In October of 2013, a condom was found on the bathroom floor in A.T.'s home.  A.T.'s sister, and primary caregiver, contacted other family members for assistance.  Although A.T.'s communication skills were limited, A.T. relayed that the condom came from Meuret.  After A.T.'s sister reported the incident to officers, A.T. was taken for a sexual assault examination.  The examination showed evidence of penetration of A.T.'s female sexual organ.

Meuret waived his *Miranda* rights and agreed to provide officers with a statement.  During his interview, Meuret described A.T. as physically handicapped and stated that A.T. told him she was three years old.  Meuret initially denied any sexual contact with A.T., but acknowledged his DNA may be on the condom.  He explained that A.T. potentially took the condom from his wastebasket at his front door, his bedroom, or the bathroom.  Meuret then told the officer that he could not remember if he penetrated A.T. with anything.  Ultimately, Meuret acknowledged touching A.T.'s breasts and digital penetration of her sexual organ, but not penile penetration.  Meuret was arrested and charged with sexual assault.

On February 6, 2014, Meuret was indicted for "intentionally and knowingly caus[ing] the penetration of the sexual organ of [A.T.] by defendant's sexual organ and/or finger, without the consent of [A.T.], against the peace and dignity of the State."  *See id*. § 22.011(a)(1)(A).  Meuret entered a plea of not guilty and the case proceeded to jury trial.

At the close of the State's case, the trial court denied Meuret's motion for directed verdict based on the State's failure to prove A.T. did not consent to the sexual act.  *See id*. § 22.011(b)(4).

The jury returned a guilty verdict and assessed punishment at sixteen-years' confinement in the Institutional Division of the Texas Department of Criminal Justice and a $5,000.00 fine.

On appeal, Meuret contends (1) the evidence is insufficient to support A.T.'s lack of consent; (2) based on the same failure of proof supporting lack of consent, the trial court erred in failing to grant Meuret's motion for directed verdict and motion for new trial; and (3) Texas Penal Code section 22.011(b)(4) is void for vagueness because it allows mere proof of general mental deficits, and not actual proof of mental disease or defect.

We turn first to the sufficiency of the evidence to support A.T.'s lack of consent.

## SUFFICIENCY OF THE EVIDENCE

### A.     Standard of Review

In reviewing the sufficiency of the evidence, "we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011); *accord Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). "This standard recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence. . . ." *Adames*, 353 S.W.3d at 860; *accord Gear*, 340 S.W.3d at 746. The reviewing court must also give deference to the jury's ability "'to draw reasonable inferences from basic facts to ultimate facts.'" *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id*. (citing *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)).

We may not substitute our judgment for that of the jury by reevaluating the weight and credibility of the evidence. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). We defer

to the jury's responsibility to resolve any conflicts in the evidence fairly, weigh the evidence, and draw reasonable inferences. *See Hooper*, 214 S.W.3d at 13; *King*, 29 S.W.3d at 562. The jury alone decides whether to believe eyewitness testimony, and it resolves any conflicts in the evidence. *See Hooper*, 214 S.W.3d at 15; *Young v. State*, 358 S.W.3d 790, 801 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). In conducting a sufficiency review, "[w]e do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure that the jury reached a rational decision." *Young*, 358 S.W.3d at 801.

**B.      Arguments of the Parties**

Meuret acknowledges that although there was some evidence of A.T.'s mental capacity, the State failed to prove beyond a reasonable doubt that the sexual penetration was without A.T.'s consent. Specifically, Meuret argues the State failed to prove beyond a reasonable doubt (a) the nature of A.T.'s mental impairment, and (b) that Meuret knew of A.T.'s mental deficiency and knew "at the time of the sexual [act that A.T.] was incapable either of appraising the nature of the act or of resisting it." *See* TEX. PENAL CODE ANN. § 22.011(b)(4). For these reasons, Meuret asserts, the trial court erred in entering judgment and denying Meuret's motions for directed verdict and new trial. In the alternative, Meuret asserts Texas Penal Code section 22.011(b)(4) is void for vagueness and, consequently, unconstitutional and a violation of his due process rights.

The State counters that the evidence of A.T.'s mental disease or defect clearly supported the conclusion that the sexual assault was without her consent.

**C.      Evidence Before the Jury**

Because much of this case relies on circumstantial evidence of A.T.'s mental disease or defect, a more thorough presentation of the evidence is warranted.

### 1. *Sonia Edelman, Sexual Assault Department Supervisor*

The first witness called by the State was Sonia Edelman, a sexual assault nurse examiner with twenty years of experience, and the head of the hospital's sexual assault division. Although Edelman did not perform the examination, she was familiar with A.T.'s medical records.[2] Edelman was offered by the State as an expert witness; she opined A.T.'s physical examination showed a tear in A.T.'s female genitalia consistent with penetration.

Edelman also explained the importance of accurately recording the history as provided by the patient. Although the records indicated that A.T. was "developmentally delayed," the nurse was able to obtain a history from A.T. The history provided as follows:

> Patient states, "I walk, I stopped at Joe's. He touched me here and here (patient indicates breast and female sexual organ by pointing). He touched here (patient indicates breasts) with his mouth. He put his wiener in his hand. (Patient demonstrates with left thumb and index finger in circle and moves hand up and down). He put his wiener in my part (patient indicates female sexual organ by pointing). Then I go home. I sat on the toilet and it fell out.

### 2. *Detective Henry Guerra*

The State's next witness was Freer Police Department Detective Henry Guerra. On October 16, 2013, Detective Guerra was informed that A.T. reported being sexually assaulted by Meuret. Detective Guerra knew A.T. and described her as a "special needs adult that lives in Freer and she's very nice, very, uh, open-hearted person." When he arrived at the police department, Detective Guerra briefly spoke to A.T.'s sister, Carmen. Carmen informed him that a used condom was found in the bathroom at their home and that A.T. told her "what happened at Mr. Meuret's residence." After asking Carmen to take A.T. to the hospital for a sexual assault examination, Detective Guerra proceeded to speak with Meuret.

---

[2] Because Sonia Edelman was not the custodian of the records, the medical records concerning A.T.'s sexual assault examination were actually admitted into evidence through Lee Swan, custodian of the records at Doctor's Regional Medical Center. *See* Tex. R. Evid. 803(6)(D) (Records of a Regularly Conducted Activity).

Meuret had previously been *Mirandized* and agreed to be interviewed by Detective Guerra. The interview was video and audio recorded and offered before the jury without objection from defense counsel. Meuret acknowledged knowing A.T. and her physical handicap.

| | |
|---|---|
| Det. Guerra: | She's 33 years of age but, uh, she's mentally and physically handicapped. Okay. You know who the young—you know, the lady we are talking about. Right. |
| Meuret: | Yeah, yeah, she's come by there and I always ask her age and she said she was 3. |

　　　　. . . .

The hand and then that 3 thing that she always did.

Meuret further acknowledged that A.T. did not look like a child, but that she was an adult woman.

Meuret told Detective Guerra that A.T. had been at his house approximately three times and that she had come over the previous night, sometime after 8:00 p.m. On multiple occasions during the interview, Detective Guerra questioned Meuret whether he knew A.T. was mentally handicapped.

| | |
|---|---|
| Det. Guerra: | [D]id she say what she was doing there? |
| Meuret: | No, uh well I, I was that, uh, I always ask her if she was—how old she was and she would say 3, and then I said well where's your, uh, I said, uh, your husband or your boyfriend and she said he's at work. |
| Det. Guerra: | Okay. |
| Meuret: | That's what she would tell me, but she was always, uh, real nice. I mean, she didn't, uh, the thing that always struck me was that she said that she was three years old. |

　　　　. . . .

I mean when she said 3, I mean that, uh, that was, uh, I knew there was something wrong.

　　　　. . . .

Well there's some reason she's saying that, . . . the 3 always threw me off.

　　　　. . . .

| | |
|---|---|
| Det. Guerra: | But can you tell that she's mentally handicapped or not? |
| Meuret: | No, I can't tell. |

At the beginning of the interview, Meuret denied any sexual contact with A.T. Even after Detective Guerra collected DNA samples, Meuret continued to deny any such contact with A.T., again referring to her telling him she was three years old. When asked whether his DNA would "come up on [A.T.'s] rape kit," Meuret responded, "Not unless she got it off the [used] condom that she found" in the wastebasket by his front door. The condom, he claimed, had "been there a long time."

Detective Guerra explained the condom would be tested, as would the sheets in Meuret's house. Meuret was adamant that he "didn't have intercourse with her. . . . She just talked to me and that was it." Meuret further told Detective Guerra that he thought A.T. may have made the accusations because she was afraid of getting in trouble with her family.

Detective Guerra continued to question Meuret about any sexual contact with A.T. When asked if he penetrated A.T. with anything, Meuret responded "Not that I remember."

| Det. Guerra: | So you're, you're, you're still going to sit there and tell me that nothing went on between you two last night. |
|---|---|
| Meuret: | No. Not that I—not that I know of. |

The only thing Meuret remembered was helping A.T. to the door. Detective Guerra's questioning returned to the used condom. Meuret admitted the condom could have also come from his bedroom or the bathroom. Meuret continued to deny any intimate contact because "[t]hat 3 years old, that threw me off right away."

Towards the end of the interview, Meuret offered, "Well I didn't penetrate her with my penis, I know that." When questioned further, Meuret acknowledged having the condom "on his penis" the previous night, but that he had thrown it away.

| Det. Guerra: | So, you didn't use [the condom] on her last night. |
|---|---|
| Meuret: | No. |
| Det. Guerra: | Then what was the purpose of just putting it on? |

Meuret:        I was trying to get a hard on.

Det. Guerra:   Okay.

Meuret:        And didn't get one.

Det. Guerra:   Okay.  Was she there at that time?

Meuret:        Umm, she was laying down.

Det. Guerra:   Laying down where?

Meuret:        On the bed.

Meuret explained, "I didn't get [an erection] cuz I kept thinking about that three years old."  Meuret claimed he threw the condom in the wastebasket, his son called and A.T. left.

When asked specifically about foreplay, Meuret acknowledged digital penetration, before putting on the condom.  Meuret denied kissing A.T., but conceded that he touched her breasts. Meuret also explained that everything happened in the living room on the sofa bed.  "She was right there, and . . . kept smiling."  According to Meuret, A.T. never told him no and never told him to stop.

*3.      A.T.'s Sister, Carmen*

Carmen, A.T.'s sister, testified that A.T. was mentally handicapped and was receiving disability benefits.  At the age of six months, A.T. contracted meningitis resulting in paralysis of her right side and seizures, generally controlled by daily medication.  Carmen further testified that A.T. could not take care of herself, could not communicate well, and had the mind of a child.

During her education, A.T. was classified as mentally retarded, had attended special education programs since elementary school, and graduated, by law, at the age of twenty-one years old.  Because of her physical disability, Carmen has to brush A.T.'s hair, tie her shoes, and help her dress.  A.T. spends much of her time coloring, watching cartoons, and playing with Carmen's six-year old daughter.  Carmen further described her six-year-old reading to A.T. each night before bedtime.

As to Meuret, Carmen testified that he was a neighbor, and although she had known him since she was young, she had never spoken to him. Carmen explained that A.T. would often walk unaccompanied through their neighborhood; a community where many family members and neighbors knew her. To her knowledge, A.T. had visited Meuret's home approximately three times, "when he had like other friends that were girls that were there."

On the morning of October 16, 2013, Carmen's husband Roland found a condom on the floor in the bathroom, next to the toilet. When Carmen's brother denied the condom belonged to him, she questioned A.T. Carmen relayed that when A.T. began crying, "I heard her say [Meuret's] name," and she knew something was wrong. Carmen took A.T. to the local police department; and, following their advice, she took A.T. to the hospital for a sexual assault examination.

*4.    A.T.*

The last witness called by the State was A.T. Based on A.T.'s "special needs," all parties agreed that Carmen would be allowed to remain in the courtroom. *See* Tex. R. Evid. 614 (excluding other testifying witnesses upon a party's request). Although the State attempted to ask questions in the simplest format, the record shows A.T.'s verbal abilities were limited. Her testimony was further complicated by A.T.'s inability to stay focused on the questions asked.

State: Tell us your name, what's your name, tell the jury what your name is.
A.T.: [A.T.]
State: What's your last name [A.T.]?
A.T.: In Freer.
State: You live in Freer?
A.T.: Yes.
State: Who do you [live] with?
A.T.: Carmen.
State: Who is Carmen?
A.T.: Sister.

A.T. testified that Roland also lives at the house. When asked, "Who is Roland?" A.T. responded, "He love Carmen." On several occasions during her testimony, A.T. become agitated but was able to calm down relatively easily. The record supports the trial court attempted to ensure that A.T. had a comfort level with the courtroom; at one point, the trial court even remarked, "You are like a movie star now with [a] microphone." The State continued questioning A.T. and redirecting her attention back to the questions at hand.

State: How old are you [A.T.]? How old are you?
A.T.: (undiscernible).
State: How old?
A.T.: Look.
State: Who is over there?
A.T.: Carmen.

The State proceeded to inquire whether A.T. knew Meuret and whether she considered him a friend. A.T. appeared fixated on Meuret having removed her clothes.

State: Do you know a man named [Meuret]?
A.T.: Him. (Pointing).
State: Who is him?
A.T.: [Meuret].
. . . .
State: Is [Meuret] a friend of yours?
A.T.: Huh-uh.
State: How do you feel about [Meuret]?
A.T.: My clothes off.
State: What? Your clothes were off?
A.T.: Yeah.
. . . .
State: What were you saying about clothes off?
A.T.: Him, he did.
State: [Meuret]?

A.T.:   Yeah.

State:  What did [Meuret] do?

A.T.:   Him clothes off.

State:  He took your clothes off?  Is that what you are saying?

A.T.:   Yeah.

State:  How did you feel about that?

A.T.:   Fine.

State:  Were you scared?

A.T.:   (Nodding head).  My God.

State:  Is that better?

A.T.:   That's good.

State:  Did [Meuret] take your clothes off?

A.T.:   Yes.

State:  Did you tell him anything?

A.T.:   No.

State:  What did you tell him?

A.T.:   To stop.

State:  You told [Meuret] to stop?

A.T.:   (Nodding head).

State:  When he was taking your clothes off?

A.T.:   Yes.

State:  How many times did you tell him to stop?

A.T.:   Yes.

State:  More than one time?

A.T.:   Yeah.

The prosecutor continued questioning A.T. regarding the contact between herself and Meuret.  A.T. often looked to Carmen for support.  When A.T. saw Carmen crying, A.T.'s focus was diverted away from the questions being asked by the prosecutor and toward Carmen.

State:  He didn't touch you in your private?

A.T.:   (Shaking head).

Q       Do you know where your private is?

A.T.:    No.

State:    Do you know where your private is?

A.T.:    (Shaking head).  My God.  Carmen cry.

State:    It's okay.  You can talk to me.  Right?  We have talked before right?

A.T.:    (Witness crying).

After calming down, A.T. tried to tell the prosecutor that she did not want to have to look at Meuret.

State:    I don't scare you do I?

A.T.:    No.

A.T.:    (Sigh) how he look.  I don't look.

State:    What?

A.T.:    [Meuret]

State:    You don't want to look at him?

A.T.:    No.

State:    Why not?

A.T.:    No

State:    You don't like [Meuret]?

A.T.:    No.

State:    What did he do to you?

A.T.:    Take clothes off.

State:    He took your clothes off?

A.T.:    (Nodding head).

Within minutes, A.T. was again upset that she could see Meuret; A.T. motioned the prosecutor to move, "More.  There. . . . There."  The prosecutor resumed his direct examination.

State:    When [Meuret] was touching you, did you tell him to stop?

A.T.:    Yeah.

State:    You didn't want him to do those things that he did to you, right?

A.T.:    No.

State:    Where did this happen?

A.T.:    In Freer.

State:  At his house?

A.T.:  Yeah.

State:  Who was there at his house?

A.T.:  Me.

State:  Just you and him?

A.T.:  (Nodding head).

State:  Anybody else there?

A.T.:  No.

State:  And where did this happen, inside the house?

A.T.:  (Shaking head).

State:  Did you ever go inside the house?

A.T.:  Him house.

State:  Did you ever go inside house?  Who was inside the house?

A.T.:  Him.

When asked in what room she was with Meuret, A.T. told the prosecutor, "Him, his room."

A.T. appeared to explain that "his room" was the living room.  The prosecutor then showed A.T.

a shirt and she acknowledged the shirt was hers.

State:  Did [Meuret] do anything with your shirt?

A.T.:  (Shaking head) he off.

State:  He took the shirt off?  Did he touch you?

A.T.:  (Nodding head).

State:  Did he touch you?

A.T.:  No.

State:  Did he touch you up here?

A.T.:  Yes.

State:  What did he touch you with?

A.T.:  The hand.

. . . .

State:  Did [Meuret] touch you down here [groin area]?

A.T.:  Yes.

. . . .

State:    [Meuret] touch you down here?

A.T.:     Oh God.  No.

State:    You sure?

A.T.:     (Shaking head).

A.T.:     He touched you down here?

State:    Yes.

A.T.:     What did he touch you with?

A.T.:     The hand.

State:    Did you tell him to stop?

A.T.:     To stop.

State:    Were you scared?

A.T.:     (Nodding head).  Yeah.

Once again A.T.'s attention turned to something other than Meuret.  She told the prosecutor that it was hot, and while the court obtained a fan for A.T., the record indicates "[A.T. was] waiving [sic] at the jury.  Juror waiving [sic] back."  When the prosecutor began to question A.T. regarding the allegations, A.T. again became upset because Carmen was crying.

A.T.:     Look, Carmen crying.

State:    Uh-huh.

A.T.:     I'm Sorry.

State:    It's okay.

A.T.:     Carmen.  She come.

State:    I see her.

A.T.:     Come here.

The trial court inquired whether A.T. wanted Carmen to come and sit with her.  When she responded affirmatively, the trial court requested a chair for Carmen.  The record reflects A.T. proceeded to hug Carmen and cry before the prosecutor resumed questioning.

When asked how she left Meuret's house, A.T. responded, "Walk."  Before offering the witness for cross-examination, the prosecutor asked one further question:

State: [A.T.], just one more question. Okay? When [Meuret] was touching you down here, did you tell him to stop?

A.T.: Yeah.

As defense counsel began his questions, A.T. extended her hand to shake defense counsel's hand, and they shook hands. Defense counsel asked A.T. whether her family members, including Carmen and Roland, liked Meuret. To each person, A.T. responded in the negative. A.T. acknowledged she liked Meuret, but then quickly apologized to Carmen.

The record reflects a very disjointed line of questioning. At one point, defense counsel offered A.T. a "cup," but A.T. instead proceeded to drink from the trial court's water bottle. When the questioning turned back to Meuret, A.T. again looked to Carmen for guidance. Like on each occasion before, Carmen redirected A.T.'s attention to the attorneys.

The State rested and the defense called only one witness, Meuret's son. His son testified that Meuret had trouble remembering things like taking his grandchildren to Sea World or directions to their house. In fact, his son testified that at the time of the incident, Meuret had gone through his retirement fund and they were in the process of placing Meuret in an assisted living facility.

## D.    Analysis

Section 22.011 of the Texas Penal Code, sexual assault, provides in part,

(a)    A person commits an offense if the person:

    (1)    intentionally or knowingly:

        (A)    causes the penetration of the anus or sexual organ of another person by any means, without that person's consent. . . .

TEX. PENAL CODE ANN. § 22.011(a)(1)(A) (West 2011).

Meuret admitted the he digitally penetrated A.T.'s sexual organ, but he challenges the sufficiency of the evidence regarding A.T.'s consent. All of Meuret's appellate issues turn on whether the penetration was without A.T.'s consent. *Id.*

The State generally is not obliged to plead one specific means of committing an offense. *See Geick v. State*, 349 S.W.3d 542, 547 (Tex. Crim. App. 2011). However, if the State elects to allege only certain of the available statutory alternatives for committing the charged offense, the State must prove the offense by one of the chosen methods alleged in the charging instrument. *Id.*; *see also Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000).

Although section 22.011 provides multiple means by which consent is not effective, the State alleged the sexual assault was without A.T.'s consent based on the following:

> penetration was without the consent of [A.T.] if the defendant knew that as a result of mental disease or defect the other person was at the time of the sexual assault incapable of either appraising the nature of the act or of resisting it.

*See* TEX. PENAL CODE ANN. § 22.011(b)(4); *see also Garcia v. State*, 661 S.W.2d 96, 97 (Tex. Crim. App. 1983) ("The female's condition, coupled with the male's *knowledge* of the mental defect or disease, substitutes for lack of consent by the female to the act of intercourse.").

We must, therefore, determine whether there was legally sufficient evidence that, at the time of the sexual assault, (1) a mental disease or defect deprived A.T. of either appraising the nature of the act or of resisting it, and (2) Meuret knew of A.T.'s mental disease or defect.

We turn first to the evidence and testimony regarding A.T.'s mental state.

*1.        Application of Texas Penal Code Section 22.011(b)(4) to A.T.*

Meuret argues that while there is evidence of A.T.'s general mental capacity, the evidence is insufficient to support that, due to a mental disease or defect, A.T. was unable to appraise the nature of the sexual act or to resist it. *See* TEX. PENAL CODE ANN. § 22.011(b)(4).

When the evidence in the record supports conflicting inferences, we must presume the trier of fact resolved the conflicts in favor of the verdict and defer to that determination. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Moreover, resolution of conflicts in the evidence or testimony presented, or inferences therefrom, is within the exclusive province of the jury, and the jury "may choose to believe all, some, or none of it." *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995); *see also McGregor v. State*, 394 S.W.3d 90, 109 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) ("A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony.").

a. Evidence of A.T.'s Mental Disease or Defect

There was significant testimony regarding A.T.'s mental disease or defect. Carmen testified that A.T. suffered from mental disease and retardation; A.T. required help "tak[ing] care of herself," because "she's not capable." A.T. also needed assistance dressing each morning, bathing, and taking her medications. Carmen further explained that A.T. has the mind of a child and often has difficulty communicating.

The testimony further supports that other members of the community, including Detective Guerra, understood A.T. to have mental disabilities and the nurse that evaluated A.T. described her with limited mental capabilities, or "developmentally delayed."

More importantly, the jury was able to personally assess A.T.'s mental disabilities, her manner of speech, her demeanor, and her testimony regarding her ability to appraise the sexual act. *See Green v. State*, No 14-06-00535-CR, 2007 WL 2265787, at *2–3 (Tex. App.—Houston [14th Dist.] Aug. 9, 2007, no pet.) (mem. op., not designated for publication). A.T. exhibited difficulty answering many of the questions posed and maintaining focus on the issue at hand. A.T. further displayed childlike behavior, including asking that Carmen sit with her during her testimony, waving at the jury, and even drinking from the trial court's water bottle.

We, therefore, conclude the evidence was sufficient to support the jury's implied finding that A.T. possessed a diminished mental capacity equating to a mental disease or defect as described in section 22.011(b)(4). *See* TEX. PENAL CODE ANN. § 22.011(b)(4); *Williams v. State*, No. 05-12-00930-CR, 2014 WL 1010074, at *3–4 (Tex. App.—Dallas Feb. 14, 2014, pet. ref'd) (not designated for publication) (citing *Rider v. State*, 735 S.W.2d 291 (Tex. App.—Dallas 1987, no pet.) (concluding testimony that victim required constant supervision, low-functioning IQ, inability to drive a car, special education in school, and officer's observation that she "did not seem quite right" sufficient to support jury's finding of mental disease or defect under section 22.011(b)(4)).

> b. Evidence of A.T.'s Ability to Appraise the Nature of the Sexual Assault or to Resist It

In addition to determining whether the evidence supports a finding of mental disease or defect, we must also determine whether the evidence supports a finding that A.T. was inacapable of appraising the nature of the sexual act or resisting the act due to her mental disease or defect.

We look to this court's opinion in *Esparza* for guidance. *Esparza v. State*, No. 04-10-00668-CR, 2011 WL 4828431 (Tex. App.—San Antonio Oct. 12, 2011, no pet.) (mem. op., not designated for publication). In *Esparza*, the victim was a thirty-four year old female suffering from several disabilities, including mental retardation. *Id.* at *1. The victim required twenty-four hour supervision and, during her education, was placed in special education programs, ultimately graduating from high school at twenty-two years old. *Id.* After the assault, the victim reported that she was "scared" of Esparza and the testimony supported the victim's outcry was limited by her ability to communicate. *Id.* at *2. After a review of the entire record, specifically the jury's observation of the victim, the court concluded the evidence was legally sufficient to support the jury's implied finding regarding the victim's inability to consent. *See id.* at *10.

In this case, the testimony described A.T. as "child-like." The medical records admitted before the jury provided A.T.'s rendition of the events: "He put his wiener in his hand. . . . He put his wiener in my part. . . . Then I go home. I sat on the toilet and [the condom] fell out." Shortly after the event, A.T. was unable to communicate with either her brother or Carmen regarding Meuret's actions without crying. Meuret's interview with officers was even more telling of A.T.'s inability to understand the sexual act or to resist it. Meuret described A.T.'s affect not like that of an adult consenting to sexual activity, but closer to that of a small child. Meuret described A.T.'s behavior during the encounter, "She . . . *kept smiling*." (emphasis added).

Once again the jury was able to assess A.T.'s ability to assess Meuret's actions. *See Martinez v. State*, 634 S.W.2d 929, 935 (Tex. App.—San Antonio 1982, pet. ref'd) (explaining that convicting jury "was favored with firsthand observation of the [complainant] on the witness stand as she struggled to relate her version of the events"); *Williams*, 2014 WL 1010074, at *4 (concluding evidence was sufficient to support complainant's inability to appraise nature of the act or resist it); *Garza v. State*, No. 13-09-00549-CR, 2012 WL 914996, at *16 (Tex. App.—Corpus Christi Mar. 15, 2012, no pet.) (mem. op., not designated for publication) (concluding a rational trier of fact could have found beyond a reasonable doubt that mental disease or defect made victim incapable of appraising nature of the act or resisting it). The jury witnessed A.T.'s childlike behavior, including A.T. waving to them, A.T. reaching out to shake defense counsel's hand, and A.T. drinking from the trial court's water bottle.

Based on the entire record, we conclude the evidence is legally sufficient to support the jury's implied finding that, because of her mental disease or defect, A.T. was unable to appraise the nature of Meuret's sexual acts or to resist them. *See Esparza*, 2011 WL 4828431, at *8–9.

We, therefore, turn to the next issue: whether the evidence was sufficient to support that Meuret knew of A.T.'s mental disabilities.

### 2. *Meuret's Knowledge of A.T.'s Mental Disease or Defect*

During his interview with officers, Meuret denied knowing that A.T. was "mentally handicapped," but proof of a defendant's state of mind "almost invariably depends on circumstantial evidence." *Tottenham v. State*, 285 S.W.3d 19, 28 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). Thus, whether Meuret knew of A.T.'s mental disease or defect is largely based on circumstantial evidence. *Compare Sanchez v. State*, 479 S.W.2d 933, 941 (Tex. Crim. App. 1972) (finding evidence sufficient to show that appellant was aware of victim's limited mental capacity when appellant knew complainant and her family, had lived in the same community for some time, and complainant was known in the community to be mentally impaired) *with Harris v. State*, 474 S.W.2d 706, 708 (Tex. Crim. App. 1972) (holding evidence insufficient to find that appellant knew complainant lacked sufficient mental capacity when he had just met her and "she could appear normal for a time" to person of limited education).

In the present case, Meuret lived in the same neighborhood as A.T. and she had been to his house approximately three times. Meuret explained he "always asked her how old she was, she was 3 and that was it." At one point, A.T. told Meuret her name was Carmen, but she refused to answer Meuret's questions regarding "where did you come from?" Because A.T. was unable to answer any additional questions, Meuret even asked "the ladies at the fire department" about A.T. He insisted A.T.'s continued statements that she was "3 years old" threw him off. In fact, Meuret even attributed his inability to procure an erection to his "think[ing] about that three years old" thing. *Cf. Harris*, 474 S.W.2d at 708 (concluding evidence was insufficient to support mens rea when defendant never met victim prior to the day of the event and the victim could have given the appearance of "being normal"). These statements are sufficient proof of Meuret's mens rea.

We also emphasize that the jury is "the sole judge of the weight and credibility of the evidence," *Adames*, 353 S.W.3d at 860, and our role is limited to "ensuring the jury reached a

rational decision," *Young*, 358 S.W.3d at 801. After reviewing "all of the evidence in the light most favorable to the verdict," and the reasonable inferences therefrom, we conclude the evidence was legally sufficient to support the jury's conclusion that Meuret knew that A.T. was unable to appreciate the nature of or resist the sexual assault by reason of mental disease or defect. *See Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson*, 443 U.S. at 318–19). Accordingly, we overrule Meuret's appellate issue regarding the sufficiency of the evidence to support the jury's conviction.

Meuret next contends the trial court erred in denying his motion for directed verdict and motion for new trial based on the same sufficiency concerns.

### E.      Motion for Directed Verdict and Motion for New Trial

Following the State's case in chief, the trial court denied Meuret's motion for directed verdict; the trial court similarly denied Meuret's motion for new trial filed shortly after the entry of judgment. "A challenge to the trial judge's ruling on a motion for an instructed verdict is in actuality a challenge to the sufficiency of the evidence to support the conviction." *Madden v. State*, 799 S.W.2d 683, 685 (Tex. Crim. App. 1990); *accord Canales v. State*, 98 S.W.3d 690, 693 (Tex. Crim. App. 2003). An appellate court "appl[ies] the same standard of review to a trial court's denial of a motion for new trial brought on the basis of insufficient evidence as we do to appellate review of legal insufficiency challenges." *Kelley v. State*, 429 S.W.3d 865, 875 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd); *see also Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006) ("A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling.").

In both motions, Meuret alleged there was no evidence or insufficient evidence to establish his guilt beyond a reasonable doubt that "he knew that as a result of mental disease of [sic] defect the alleged victim was at the time of the alleged sexual assault incapable either of appraising the

nature of the act or of resisting it." Having already concluded the evidence is legally sufficient to support the findings that (1) mental disease or defect deprived A.T. of either appraising the nature of the act or of resisting it and (2) Meuret knew of A.T.'s mental disease or defect, we overrule Meuret's complaints regarding the trial court's denial of his motion for directed verdict and his motion for new trial.

**F.      Void for Vagueness**

In his last issue on appeal, Meuret contends the jury's verdict requires a finding that section 22.011(b)(4) allows mere proof of general mental deficits, and not actual proof of A.T.'s mental disease or defect depriving her of the ability to appraise the nature of the act or to resist it. As such, Meuret contends Texas Penal Code section 22.011(b)(4) is unconstitutionally vague and denied Meuret due process of law. *See* U.S. CONST. amend. V, XIV; TEX. CONST. art. 1, § 19; TEX. PENAL CODE ANN. § 22.011(b)(4). "It is a basic principle of due process that a statute is void for vagueness if its prohibitions are not clearly defined." *State v. Holcombe*, 187 S.W.3d 496, 499 (Tex. Crim. App. 2006).

*1.      Constitutionality of a Statute*

When reviewing an attack upon the constitutionality of a statute, an appellate court presumes the statute is valid and the legislature has not acted unreasonably or arbitrarily. *See Rodriguez v. State*, 93 S.W.3d 60, 69 (Tex. Crim. App. 2002); *Ex parte Ports*, 21 S.W.3d 444, 446 (Tex. App.—San Antonio 2000, pet. ref'd). The party challenging the statute's constitutionality bears the burden of establishing that it is unconstitutional. *Ports*, 21 S.W.3d at 446.

Due process requires criminal laws be defined sufficiently such that (1) fair notice is given to ordinary persons as to what conduct is forbidden; and (2) definite standards are established to prevent arbitrary and discriminatory enforcement by police, judges, and juries. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *accord Lawrence v. State*, 240 S.W.3d 912, 915 (Tex.

Crim. App. 2007) (quoting *Holcombe*, 187 S.W.3d at 499) ("A statute is void for vagueness if it fails to define the criminal offense 'with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not permit arbitrary and discriminatory enforcement.'"). "[A] statute is not unconstitutionally vague merely because the words or terms employed in the statute are not specifically defined." *Maloney v. State*, 294 S.W.3d 613, 628 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (citing *Engelking v. State*, 750 S.W.2d 213, 215 (Tex. Crim. App. 1988)) (noting that words not specifically defined in a statute are given their plain meaning); *see also Holcombe*, 187 S.W.3d at 499.

### 2.    *Fair Notice to Ordinary Persons*

The first prong requires the statute "provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *State v. Markovich*, 77 S.W.3d 274, 279 (Tex. Crim. App. 2002) (citing *Grayned*, 408 U.S. at 108). To constitute fair notice, the statute must communicate "in words of common understanding." *Baird v. State*, 212 S.W.3d 624, 629 (Tex. App.—Amarillo 2006, pet. ref'd) (citing *Markovich*, 77 S.W.3d at 280. "All that is required is that it give fair warning in light of common understanding and practices." *Flores v. State*, 215 S.W.3d 520, 527 (Tex. App.—Beaumont 2007), *aff'd*, 245 S.W.3d 432 (Tex. Crim. App. 2008).

The statute provides that sexual assault is without consent if "the actor knows that as a result of mental disease or defect the other person is at the time of the sexual assault incapable either of appraising the nature of the act or of resisting it." TEX. PENAL CODE ANN. 22.011(b)(4). Here, the statute sets forth, in "words of common understanding," *see Baird*, 212 S.W.3d at 629, that it is a crime to engage in sexual activity with a person who, due to mental disease or defect, is incapable of understanding the sexual acts, *see* TEX. PENAL CODE ANN. § 22.011(b)(4). The words contained within section 22.011(b)(4) can be given their plain meaning and ordinary people can understand what conduct is prohibited. *See* TEX. PENAL CODE ANN. § 22.011(b)(4); *Holcombe*,

187 S.W.3d at 499. We, therefore, conclude the statute provides fair notice of the forbidden conduct and is sufficiently clear so a person of ordinary intelligence could understand what conduct is prohibited. *See Grayned*, 408 U.S. at 108; *Holcombe*, 187 S.W.3d at 499; *see also Martinez v. State*, 323 S.W.3d 493, 507 (Tex. Crim. App. 2010).

### 3. Guidelines for Those Who Enforce

The second prong requires the statute provide "explicit guidelines for those who enforce them." *Markovich*, 77 S.W.3d at 279 (citing *Grayned*, 408 U.S. at 108). Although Meuret contends the term "mental disease or defect" allowed for a conviction based on mere proof of general mental deficits, we disagree. The statute contains objective criteria upon which the jury could determine what conduct was prohibited. *See* TEX. PENAL CODE ANN. § 22.011(b)(4); *Holcombe*, 187 S.W.3d at 499. The record contains significant testimony and discussion regarding A.T.'s mental disease or defect. The trial court's charge clearly defined the prohibited activity. *See Holcombe*, 187 S.W.3d at 499. The jury could reasonably determine whether Meuret knew of A.T.'s mental disease or defect and whether such mental disease or defect prohibited her from appraising the nature of the sexual act or resisting it. *See Martinez*, 323 S.W.3d at 508. We cannot conclude the enforcement of the statute was either arbitrary or capricious. *See Holcombe*, 187 S.W.3d at 499. Accordingly, we overrule Meuret's last issue on appeal.

#### CONCLUSION

Having overruled each of Meuret's issues on appeal, we affirm the judgment of the trial court.

Patricia O. Alvarez, Justice

PUBLISH