**Opinion issued November 24, 2020**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00221-CR

———————————

**STEVEN WALLACE HOPKINS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 174th District Court
Harris County, Texas
Trial Court Case No. 1518270

## O P I N I O N

Steven Wallace Hopkins appeals from his judgment of conviction for the offense of aggravated sexual assault. On appeal, Hopkins contends that:

(1) the evidence is legally insufficient to support the jury's guilty verdict;

(2) the charge did not require the jury to find the aggravating circumstance necessary to find him guilty of aggravated sexual assault; and

(3) the charge created an unconstitutional presumption of non-consent. We affirm.

## BACKGROUND

A grand jury indicted Hopkins for aggravated sexual assault. The indictment alleged that Hopkins intentionally and knowingly caused his mouth to contact the sexual organ of J.S., a disabled individual, without consent. The indictment further alleged that consent was lacking because Hopkins knew that, as a result of mental disease or defect, J.S. was incapable of appraising the nature of the act or of resisting it. Hopkins pleaded not guilty and was tried by a jury.

At trial, the defense admitted Hopkins performed oral sex on J.S. It disputed that J.S. was incapable of consenting due to mental disease or defect.

The State called five witnesses: J.S., his mother, his cousin, the investigating detective, and a clinical psychologist. The defense called no witnesses of its own.

J.S.'s mother testified that her son, who was 23 at the time of trial, has lived with her his entire life. When he was a baby and child, he was developmentally delayed. He has always been behind his peers emotionally and developmentally. In high school, J.S. was enrolled in special education classes and classes modified for his abilities. He played trumpet in the school band.

She testified that her son presently works at a tire shop owned by a friend of the family. At work, J.S. performs manual labor, such as taking off tires and putting

2

them back on. His mother and boss provide transportation to and from work. J.S. does not have a driver's license, and his mother does not think he has the ability to drive at present.

Since his father's death in April 2017, J.S. has received survivor's income as an adult disabled person. J.S. and his mother discuss how to make use of this income as well his earnings from his job at the tire shop.

His mother testified that J.S. dresses himself. He may be able to cook simple things, like bacon and eggs. But usually someone will oversee his cooking. J.S. plays the guitar and video games. He attends church. He also has friends with whom he spends time.

Asked whether someone would immediately know that J.S. is disabled upon meeting him, his mother testified it was difficult to say. A person who has experience with a disabled family member might be able to do so. But she testified that J.S.'s disability would be apparent from a brief conversation because his speech is not as clear and he struggles to enunciate and pronounce words. J.S. "can hold a conversation for the most part." But he tends to think about and understand things in a "very literal" fashion.

J.S.'s mother testified that her son's maturity level is six or seven years behind his age. He gets along well with his 15-year-old brother because at present "most of the time he's more like the 15-year-old in development and playing games and things

like that." J.S.'s mother described him as "very trusting, especially of older people." She stated that before the assault J.S. did not understand that there were "bad people" out there who might hurt him.

In 2016, when J.S. was 20 years old, his parents let him stay with his cousin Daryl to help level a house, which is how Daryl earned a living. At the time, J.S. had the maturity of a 12- or 13-year old or at most of a 16-year-old. When someone told him to do something, he usually did it. During his stay with Daryl, J.S. called his mother crying, which was unusual. J.S. told her that someone had touched him inappropriately. He did not tell her all the details, however, due to embarrassment.

His mother stated that she did not think her son had the wherewithal to resist sexual advances at the time. While J.S. had the physical strength to defend himself, she testified he lacked the cognitive ability to understand that someone might try to manipulate him to participate in acts of a sexual nature.

During her testimony, the State introduced a 2016 medical record from Texas Children's Hospital corroborating her assessment of her son. The record states the conclusion of a medical doctor, Monica Thint, that J.S. "is incapable of protecting himself from inappropriate sexual advances." But this record was made after J.S.'s contact with Hopkins.

Detective D. Wright of the Pasadena Police Department investigated J.S.'s allegations. As part of her investigation, she spoke with J.S. and his parents. She also interviewed Hopkins.

When Wright interviewed J.S., he "appeared more childlike" than his age after speaking with him "for just a few minutes." His answers to her questions were "a little bit more simplistic" than an adult's. J.S. said he told Hopkins "that he did not want to do anything with him and he told him that a couple of nights prior as well and that he was sexually assaulted anyways." A couple of days beforehand, Hopkins had shown J.S. some pornography on his phone and made sexual advances, but J.S. told Hopkins "he didn't want that." J.S. was consistent that he never wanted Hopkins's mouth on his penis. But J.S. told Wright that Hopkins did not use force or threats of force to obtain sex. In a statement that J.S. gave to the officer who initially responded, J.S. said he thinks homosexual sex is immoral.

When Wright interviewed Hopkins, Hopkins told her that J.S. consented to their sexual activities. When officers went to Hopkins's residence to arrest him about a month after the interview, they found that he had moved out of state. Wright testified that Hopkins's move could be a sign of guilt.

Wright also reviewed some of J.S.'s medical records. One record made after the assault indicated that J.S. "mentally is on a fourth to sixth-grade level." Wright testified that, under Texas law, J.S. would be unable to consent if his mind is at such

5

a childlike degree of development and that this would remain true if he had the mind of a young teen or even a 16-year-old.

J.S.'s cousin, Daryl, testified that J.S. came to stay with him for a short while in 2016 to help level a house and do some other work. J.S. wanted to move out of his parents' home and live independently. But Daryl stated that J.S. lacked the ability to do so because he "didn't have the capacity to pay his own bills, to make decisions for himself, to drive down the road." Staying with Daryl represented a kind of compromise, allowing J.S. to experience some independence from his parents while being under another's care.

Daryl characterized Hopkins as "a creepy neighbor." According to Daryl, Hopkins often raised the topic of gay sex in a way that made Daryl uncomfortable. These sexual conversations were unwanted.

When J.S. came to stay with Daryl, Daryl told Hopkins that J.S. was "kind of mentally slow so he's sexually just off limits." Daryl thought it was necessary to tell Hopkins this because of the "unwanted sexual advances" Hopkins had directed toward him. Hopkins responded, "okay."

A couple of days before the assault, Daryl and J.S. decided to go to a bar to shoot pool. Daryl invited Hopkins "to be polite," as Daryl and J.S. had discussed their plans in front of Hopkins. But Daryl testified that he was "a little bit concerned" about having Hopkins accompany them. During this outing, Daryl played pool with

a woman while J.S. and Hopkins played pool at an adjacent table. At one point, J.S. told Daryl that he felt very uncomfortable because Hopkins was making sexual advances on him. So the three of them left the bar together, as Hopkins had ridden there with Daryl and J.S. The ride home was awkward, but Daryl did not broach the subject of Hopkins's advances on J.S. Afterward, Daryl and J.S., on the one hand, and Hopkins, on the other, went their separate ways.

A couple of days later, Daryl left J.S. on his own while Daryl went to work. Daryl was at work for about an hour when he got a call from J.S.'s mother. She told him that something was "terribly wrong" with J.S. and that Daryl "needed to go check it out." When Daryl returned home, he found J.S. "sitting there with a knife in his hand shaking, red, red in the face, and tears rolling down his eyes." J.S. said that Hopkins "tried to rape him." Afterward, Daryl telephoned the police.

J.S. testified that growing up "was rough because it was hard to fit in." He "was always different" because he had difficulty understanding things and communicating with others. He doesn't drive because it is hard for him to know when to do things, like stop, and he has poor reflexes.

J.S. was excited to stay with Daryl because Daryl said he would help J.S. learn to cook and take care of himself so that J.S. could be more independent. J.S. was frustrated living at home because most of his siblings had become more independent than him and it was hard to watch them pass him by.

While staying with Daryl, J.S. met Hopkins. J.S. recalled the three of them going to the bar. J.S. described Hopkins as "being like way too nice." When Hopkins reached for his beer, he placed his hand on J.S.'s hand, which J.S. did not like. J.S. said that Hopkins looked at him the way "a woman looks at a guy." According to J.S., he told Daryl that he wanted to leave the bar, but J.S. did not explain that he wanted to leave because of Hopkins until later.

A couple of days later, Daryl left J.S. alone at home. J.S. had sometimes been left alone at his own house for short periods of time. J.S. went outside and encountered Hopkins, who asked him to go inside his apartment to retrieve Hopkins's cigarettes. J.S. agreed to do so because he thought of Hopkins, who was 53 years old, as a "nice elderly man." J.S. stated that he "kind of trusted" Hopkins to be "nice."

When J.S. entered Hopkins's apartment to get the cigarettes, Hopkins followed him in and then locked the door, which made J.S. suspicious. But J.S. dismissed the suspicion because he recalled Daryl telling him that the apartment complex was "a ghetto place" and "kind of dangerous." Hopkins then asked J.S. if he had "ever been with a guy." J.S. told him that he had not. In fact, J.S. had not had sex with anyone before. Hopkins then asked J.S. if he wanted to try being with a guy, and J.S. said "no." J.S. testified that he did not want to have sex with Hopkins because "it's unchristian-like and that's not how God made us."

At this point, Hopkins asked J.S. if he "wanted a drink of Jack Daniels." J.S. accepted because he "wanted to try it." He testified, "Part of me wanted to do something stupid." J.S. does not recall how much he drank, but afterward Hopkins again asked him if he wanted to try being with a guy. J.S. responded that he did not know but then said "no."

Hopkins persisted, asking if he could pull down J.S.'s pants. J.S. testified he was "scared and confused." When asked what he was confused about, J.S. replied, "What to do, because I've never got taught how to get out of that situation before and I really didn't know how to defend myself."

Hopkins suggested J.S. watch pornography, which J.S. did. Hopkins then asked J.S. to pull down his own pants. J.S. did so and Hopkins touched J.S. over his underwear. Hopkins later removed J.S.'s underwear and touched J.S.'s penis with his hands. When asked what was going through his mind at this point, J.S. testified, "That I probably should do whatever he says so I don't get hurt." J.S. had difficulty explaining why he thought he might get hurt, but testified, "I figured after whatever happened to me, if I was okay, then I could tell my mom or my dad."

Hopkins eventually performed oral sex on J.S. Asked how this made him feel, J.S. testified, "A part of me—I don't know if it's my body or whatever, part of me felt good, but a part of me felt like I was violated." He explained that he felt violated because he had been "saving" his "virginity for a Christian woman." But J.S.

9

testified he was "too scared and confused" to fight off Hopkins. Afterward, Hopkins asked J.S. to touch him. J.S. said "no" but did what Hopkins asked.

J.S. agreed that he understood what was going on in Hopkins's apartment but said he did not leave because he was afraid. J.S. conceded that Hopkins did not threaten him. When asked if anything prevented him from resisting Hopkins's advances, J.S. said he "was just afraid of him and scared" and "didn't know what to do or know how to react."

Afterward, J.S. went back to Daryl's apartment and took a shower. Then he went and borrowed someone's phone to call his mother. He told his mother what had happened and later told a detective.

Daniela Costa, a clinical psychologist who evaluated J.S. after the assault, was the final witness. Costa testified that she administered an IQ test and the Wide Range Achievement Test to J.S. Costa explained that "an IQ test looks at a person's cognitive functioning, and it's broken down into various subtests," including ones that assess "verbal reasoning skills, nonverbal reasoning skills, short-term memory, and processing speed and mental quickness." The Wide Range Achievement Test differs in that it is an academic achievement test that "looks at reading, spelling, and math skills."

J.S.'s IQ test showed that he has a Full Scale IQ of 70, with a 95 percent probability that his IQ falls in the range between 67 and 75. The Full Scale IQ "is

the aggregate of the Verbal and Performance scores and is usually considered to be the most representative measure of global intellectual functioning." J.S.'s score of 70 is "low" and shows that he "is functioning within the borderline range relative to peers of comparable age." Costa characterized a score of 70 as "mild intellectual impairment, equivalent to a mild" intellectual disability or as being "right on the cusp" of intellectual disability, whereas a score lower than 70 indicates "definite" intellectual disability.[1] The range from 67 to 75 spans a continuum from "extremely low to borderline."

Among her diagnoses, Costa concluded J.S. has a mild neurocognitive disorder, borderline intellectual functioning, and mild intellectual impairment. A mild neurocognitive disorder is a "cognitive impairment," which, in layman's terms, means "IQ problems, attention problems, problems with decision-making processes, problems with memory." Borderline intellectual functioning, in turn, means "there's problems with overall comprehension and reasoning" but "not low enough to be considered" intellectually disabled. Costa opined that a person of such limited intellectual functioning would not be able to live well independently. Due to

---

[1]  In her testimony, Costa used the term "mental retardation." In our opinion, we instead use the term "intellectual disability." There is no difference in meaning, but the latter term reflects current clinical and legal usage. *See Ex parte Cathey*, 451 S.W.3d 1, 11 n.23 (Tex. Crim. App. 2014) (noting change in clinical terminology); TEX. GOV'T CODE § 325.0123(a) (directing review of statutes to revise them to replace "mental retardation" with "intellectual disability").

"problems with judgment and reasoning," such a person requires "support, some assistance." As to J.S.'s mild intellectual impairment, Costa concluded further investigation was necessary to ascertain the extent of the impairment, given that his IQ was 70 or possibly lower.

J.S.'s scores on the Wide Range Achievement Test were "in the low range" and indicate he functions "at a 4th to 6th grade school level." Costa opined that a person functioning at this level "would know right from wrong" but "wouldn't necessarily be able to consent" to sex due to "impaired judgment reasoning, poor decision-making skills." Costa concluded that J.S. is like a minor. She agreed with Dr. Thint's assessment that J.S. cannot make mature, adult decisions in response to sexual advances.

Costa also treats victims of sexual assault in her practice. She testified that some "freeze in the situation" due to "shock, disbelief." They "just kind of become overwhelmed and don't know how to react." That's a reaction that a person of normal intelligence might have. A person with J.S.'s reduced level of intellectual functioning would "have difficulties making a quick decision," and "his judgment is going to be impaired."

The jury found Hopkins guilty as charged. It assessed his punishment at 18 years' confinement. Hopkins appeals.

## DISCUSSION

### I.      Legal Sufficiency of the Evidence

Hopkins argues the evidence is insufficient to prove he committed sexual assault or aggravated sexual assault. As to sexual assault, he maintains that lack of consent is unproved because the evidence is insufficient to show that:

- J.S. has a mental defect that made him incapable either of appraising the nature of Hopkins's sexual advances or of resisting them; or

- Hopkins understood that J.S. has a mental defect of this magnitude.

As to aggravated sexual assault, Hopkins argues that J.S.'s disability is unproved because the evidence is insufficient to show that he is substantially unable to protect himself from harm or to provide food, shelter, or medical care for himself.

### A.      Standard of review

In a legal-sufficiency review, we view all the evidence in the light most favorable to the prosecution and determine whether any rational jury could have found the essential elements of the crime beyond a reasonable doubt. *Lang v. State*, 561 S.W.3d 174, 179 (Tex. Crim. App. 2018). The jury is the lone arbiter of the weight of the evidence and witness credibility. *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016). We defer to the jury's resolution of evidentiary conflicts and the inferences drawn from the evidence as long as the inferences are reasonable ones supported by the evidence rather than mere speculation. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017). Direct and circumstantial

13

evidence are equally probative, and the latter alone can suffice to prove guilt. *Johnson v. State*, 560 S.W.3d 224, 226 (Tex. Crim. App. 2018).

### B.  Applicable law

A person commits sexual assault if he intentionally or knowingly places his mouth on another's sexual organ without consent. TEX. PENAL CODE § 22.011(a)(1)(C). Such an act is done without consent if "the actor knows that as a result of mental disease or defect the other person is at the time of the sexual assault incapable either of appraising the nature of the act or of resisting it." *Id.* § 22.011(b)(4). The same conduct constitutes aggravated sexual assault if the victim is a "disabled individual," which is "a person older than 13 years of age who by reason of age or physical or mental disease, defect, or injury is substantially unable to protect the person's self from harm or to provide food, shelter, or medical care for the person's self." *Id.* § 22.021(a)(1)(A)(iii), (a)(2)(C), (b)(3).

### C.  Analysis

### 1.  Consent

Hopkins argues there is legally insufficient evidence that J.S. did not consent to oral sex. Hopkins maintains the evidence does not show that (1) J.S. was incapable of appraising the nature of oral sex or of resisting it; or (2) Hopkins knew J.S. was incapable of appraising the nature of oral sex or resisting it. *See Harris v. State*, 474

S.W.2d 706, 708 (Tex. Crim. App. 1972) (construing prior version of statute as requiring proof of victim's incapability and defendant's awareness of it).

In response, the State emphasizes that it only had to prove that J.S. was incapable of appraising the nature of oral sex or resisting it, not both, and that Hopkins knew of J.S.'s incapability. *See* PENAL § 22.011(b)(4); *Wootton v. State*, 799 S.W.2d 499, 501–02 (Tex. App.—Corpus Christi 1990, pet. ref'd) (in addition to defendant's knowledge of incapability, consent depends on victim's "ability to appraise the nature of the sexual act or the ability to resist it"). But the State maintains that the evidence is legally sufficient to show all three circumstances in any event.

### a. Incapability of appraising the nature of the sexual act

Hopkins argues the evidence is legally insufficient to show that J.S. was incapable of appraising the nature of oral sex because J.S.:

- testified he knew what was going on in Hopkins's apartment;

- understood the difference between gay and straight sex; and

- knew what flirting was and had girlfriends in the past.

At the outset, we note that the Penal Code does not define the phrase "the nature of the act." Our sister court has held that the mere fact that a person understands *something* about sex is not necessarily enough to show he is capable of appraising its nature. *See Green v. State*, No. 14-06-00535-CR, 2007 WL 2265787,

at *2–3 (Tex. App.—Houston [14th Dist.] Aug. 9, 2007, no pet.) (mem. op., not designated for publication). The ability to appreciate an act's potential ramifications and consequences in addition to its physical mechanics is relevant. *See id.* Bearing this in mind, we consider the evidence and Hopkins's evidentiary arguments.

For support that J.S. knew what was going on, Hopkins relies on a single question and answer from defense counsel's cross-examination:

Q. [J.S.], what you described, you knew what was going on, right?

A. Yes.

But the jury was not obliged to accept J.S.'s answer to this vague question as proof that he could appraise the nature of oral sex. J.S. gave a detailed account of the encounter. Among other things, the jury heard J.S. repeatedly testify that he was afraid and confused and did not know how to resist Hopkins. J.S. also testified that he felt he should do as he was told and thought he could seek help from his mother or father afterward. As the arbiter of the weight of the evidence and conflicts in the evidence, the jury reasonably could have found that J.S.'s one-word affirmation that he "knew what was going on," given in response to a leading question, was entitled to less weight than the remainder of his testimony or even no weight in light of his testimony as a whole. *See Balderas*, 517 S.W.3d at 766 (jury weighs evidence); *Villa*, 514 S.W.3d at 232 (jury resolves evidentiary conflicts); *see also Rodriguez v. State*, No. 14-06-00108-CR, 2007 WL 1892302, at *4 (Tex. App.—Houston [14th

Dist.] July 3, 2007, no pet.) (mem. op., not designated for publication) (jury was free to credit victim's testimony on direct in case in which victim who was prone to suggestion testified differently on cross-examination).

Hopkins further argues that J.S.'s speech and demeanor on the stand demonstrated that he understood the nature of the sexual act. Hopkins urges that J.S. used appropriate adult words to describe the sexual encounter and "told his story in a manner that was consistent with someone of at least medium intellectual functioning and perhaps even higher intellectual ability." But the evaluation of a witness's demeanor is for the jury. *See Temple v. State*, 390 S.W.3d 341, 363 (Tex. Crim. App. 2013). The jury saw and heard J.S.'s testimony firsthand, which allowed it to assess his cognitive abilities in general and his ability to appraise the nature of the sexual act in particular. *Meuret v. State*, 500 S.W.3d 539, 550–51 (Tex. App.— San Antonio 2016, no pet.). J.S.'s testimony was not as uniformly mature as Hopkins suggests. For example, J.S. testified that he acceded to Hopkins's advances in part because he could seek help from his mother or father afterward. The jury could have reasonably found that J.S.'s reliance on his parents for guidance and protection in sexual matters at the age of 20 indicated that he did not understand the act.

As to J.S.'s awareness of the difference between homosexual and heterosexual sex, the jury could have reasonably found that it did not show he understood the nature of oral sex. J.S. testified that he did not want to have sex with Hopkins because

17

he disapproves of homosexuality. But moral disapproval of homosexuality in general does not necessarily show an ability to appraise the nature of any particular sex act. Whether a category of sex is right or wrong is a distinct issue from whether one can appraise the nature of a sex act in which one participates. *See Green*, 2007 WL 2265787, at *3 (perceived rightness or wrongness of sex act is distinct question from ability to understand its nature). For example, a childlike or simpleminded person might believe that sex outside marriage is right or wrong because he has been told that this is so by others without understanding much about sex itself. Indeed, in this case, Dr. Costa testified that J.S.'s limited intellectual functioning meant he "would know right from wrong" but "wouldn't necessarily be able to consent" to sex due to "impaired judgment reasoning, poor decision-making skills."

Nor does J.S.'s testimony about flirting or girlfriends show that he understood the nature of oral sex. The evidence as to flirting is limited. On the one hand, J.S. testified that his cousin Daryl probably talked to a lady at the bar so that he could flirt with her. But J.S. did not explain what he meant. Moreover, his testimony describing Hopkins's apparent flirtation with him at the bar was childlike. J.S. described Hopkins as being "way too nice." As to girlfriends, J.S. testified that he has had one girlfriend. He denied being physically intimate with her beyond hugging and handholding. The jury could have reasonably found that this evidence concerning behavior far more innocent in character than oral sex does not show an

18

ability to appraise the nature of that act. *Cf. Rodriguez*, 2007 WL 1892302, at \*2–4 (evidence sufficient to show victim was unable to appraise nature of act despite her testimony that she had sex with someone other than defendant, enjoyed sex with defendant, and liked looking at pornography).

The evidence as to J.S.'s ability to understand the nature of oral sex is mixed. But viewing all the evidence in the light most favorable to the verdict, we hold it is legally sufficient to prove J.S. could not appraise the nature of the sex act.

### b. Incapability of resisting the sexual act

Hopkins argues the evidence is legally insufficient to show that J.S. was incapable of resisting oral sex. Among other things, Hopkins maintains that the evidence shows J.S. was strong and physically capable of defending himself. Hopkins further notes that J.S. initially refused his advances, thus demonstrating that J.S. had the ability to resist receiving oral sex had he not desired it.

In considering whether a person is incapable of resisting a sexual act due to mental disease or defect, we focus on whether he has the presence of mind or force of will to resist. *See Wootton*, 799 S.W.2d at 501–02 (evidence showed that victims were non compos mentis and unable to resist defendant's sexual advances). Though a person may have the physical capability to resist, the question is whether he has the mental wherewithal to harness that capability. *See Green*, 2007 WL 2265787, at \*4 (evidence that victim did not know how to respond to sexual advance from

19

someone he perceived as more powerful sufficient to show inability to resist defendant he believed was stronger even though victim had fought others in past).

The evidence as to J.S.'s ability to defend himself physically is more mixed than Hopkins acknowledges. J.S.'s mother testified that she believed her son "has the physical capacity" to resist unwanted advances. But she also testified that J.S. suffers from serious medical problems, including congenital heart disease and other heart problems, iatrogenic hypoparathyroidism, and growth hormone deficiency. J.S. is short in stature, standing at about five feet five inches in height. His hypoparathyroidism affects his ability to control his muscles. J.S. testified that he has poor reflexes. Having heard this evidence and had the opportunity to view both J.S. and Hopkins in the courtroom, the jury could have reasonably found that J.S.'s ability to physically resist was more limited than Hopkins suggests.

At any rate, J.S.'s physical ability to resist, standing alone, is not dispositive. Texas's sexual-assault statute enumerates multiple circumstances under which consent is lacking. PENAL § 22.011(b). One of these circumstances is when the victim is "physically unable to resist." *Id.* § 22.011(b)(3). The State, however, did not charge Hopkins under this provision. The State instead charged Hopkins under another provision alleging that consent was lacking because Hopkins knew that by reason of mental disease or defect J.S. was "incapable either of appraising the nature

of the act or of resisting it." *Id.* § 22.011(b)(4). Under this provision, the issue is whether J.S. had the cognitive ability to resist Hopkins's advances. *See id.*

Though J.S.'s mother said she believed her son has the physical ability to resist, she elaborated that she doubted "he has the cognitive ability to understand that someone was trying to—someone would be trying to hurt him or manipulate him into doing something like that." Her assessment was echoed by the medical doctor and the psychologist who evaluated J.S. Dr. Thint concluded that J.S. "is incapable of protecting himself from inappropriate sexual advances." Dr. Costa agreed that J.S. cannot respond to sexual advances as an adult would.

The jury could have reasonably found that J.S.'s own testimony corroborated the other evidence that he lacked the cognitive ability to resist Hopkins's sexual advances. He testified that he did not consider fighting off Hopkins's advances because he "was too scared and confused" to do so. He further testified, "I really didn't know how to defend myself." When asked on cross-examination whether he would have prevailed in a fight with Hopkins, J.S. said, "I don't know." J.S. described Hopkins as "old" or "elderly," but said that he nonetheless was imposing or overbearing in appearance when J.S. was in his apartment. Whether Hopkins actually was imposing or overbearing is debatable, but J.S.'s perception, rather than the reality, is what matters. *See Green*, 2007 WL 2265787, at *4.

As to whether J.S. initially refused but eventually acquiesced to Hopkins's sexual advances, the record is susceptible to more than one reasonable interpretation. But Hopkins's argument in this regard is premised on the notion that J.S. withheld but then gave actual consent, which is legally irrelevant. In a prosecution alleging lack of consent due to mental disease or defect, "the victim's testimony concerning actual consent or lack of actual consent is immaterial." *Rider v. State*, 735 S.W.2d 291, 293 (Tex. App.—Dallas 1987, no pet.). "The issue is the victim's capacity to consent." *Id.* Section 22.011(b)(4)'s purpose "is to protect those whom the law deems incapable of consent." *Id.*; *accord Samayoa v. State*, Nos. 01-13-00537-CR & 01-13-00538-CR , 2014 WL 3608216, at *2 (Tex. App.—Houston [1st Dist.] July 22, 2014, pet. ref'd) (mem. op., not designated for publication). A person who is incapable of giving consent under this provision is likewise incapable of withholding it. *Rider*, 735 S.W.2d at 293. Thus, J.S.'s initial reticence or refusal to engage in sexual activity with Hopkins is not evidence of capability to resist.

Moreover, even if J.S.'s ostensible reticence or refusal followed by acquiescence had some evidentiary value as to his capability to resist, the jury also heard evidence that J.S. was obedient. His mother testified that J.S. usually did as told and was especially trusting of older people. Based on this testimony, a reasonable jury could find that J.S.'s capitulation to Hopkins's sexual advances reflected an inability to resist them rather than the ability to do so.

Viewing all the evidence in the light most favorable to the jury's verdict, we hold that legally sufficient evidence proves J.S. could not resist the sex act.

### c. Knowledge of the victim's incapability

Hopkins argues that even if J.S. was incapable of appraising the nature of oral sex or resisting it, Hopkins did not know of J.S.'s mental disease or defect. He argues that any mental disease or defect J.S. might have had was "latent and unobtrusive to persons who did not have a close and personal relationship with him." Having met J.S. on just two occasions, Hopkins argues he lacked the kind of close personal relationship necessary to recognize J.S.'s cognitive limitations. Hopkins acknowledges that Daryl told him that J.S. was "kind of mentally slow," but maintains that this conclusory statement was insufficiently informative.

Proof of a defendant's state of mind, including his knowledge of another's mental disease or defect, almost always depends on circumstantial evidence. *Meuret*, 500 S.W.3d at 551. In general, circumstances like familiarity with the victim or readily perceptible intellectual shortcomings support a finding of knowledge. *See, e.g.*, *Sanchez v. State*, 479 S.W.2d 933, 941 (Tex. Crim. App. 1972) (evidence defendant had known victim for some time combined with testimony of other witnesses that victim's deficiency was obvious held sufficient to show defendant knew of victim's mental defect). But a defendant's knowledge must be assessed based on the particular circumstances of each situation on a case-by-case basis.

The evidence shows that Hopkins did not know J.S. for long. But he did visit a bar with Daryl and J.S. days before the assault. At the bar, J.S. sang karaoke at Hopkins's urging, and Hopkins flirted with J.S. J.S. stated that he did not drink any alcoholic beverages at the bar. Hopkins thus personally interacted with J.S. and had an opportunity to observe J.S.'s ordinary behavior for a period of time in a social setting. This is significant because Detective Wright testified that J.S.'s more childlike nature became apparent after talking with him for "a few minutes."

Hopkins argues that J.S.'s own mother testified that it would be hard "for someone to notice that J.S. was impaired simply by looking at him." As discussed, however, Hopkins's interaction with J.S. was not limited to simply looking at him. Moreover, J.S.'s mother's testimony on this topic undermines Hopkins's position:

> Q. When you first meet [J.S.]—when other people meet him, are they able to tell immediately just by looking at him that he has a disability?
>
> A. That's difficult to answer. If you've had experience with someone in your family who's disabled, then maybe. But upon just visual recognition, unless you see him speak—he has some movements with his mouth, he'll kind of do this type of thing sometimes (indicating) and other facial movements that you will notice are different and not normal, per se.
>
> Q. Just having a conversation with [J.S.] for a couple of minutes, do you think someone might be able to notice a difference?
>
> A. I believe so. His speech is not as clear, and he has difficulty enunciating and pronouncing different words.

J.S.'s mother additionally testified that he is six or seven years behind his peers emotionally and developmentally. She stated that "one minute he's exhibiting adult behaviors, but most of the time he'll kind of revert back into the six or seven years behind where he is."

Hopkins urges that other evidence shows J.S. does not seem impaired. For example, J.S. can read and write, works at a tire shop, and plays musical instruments. But the record does not show that Hopkins saw J.S. engaged in these activities. Thus, Hopkins cannot claim that these activities informed his impression of J.S. Instead, Hopkins suggests that anyone who can perform these activities cannot be impaired to an extent that would be obvious. We disagree.

Evidence of an ability to perform these activities, standing alone, says nothing about the quality of their performance or the impression that J.S. makes on others while performing them. The results of J.S.'s Wide Range Achievement Test shows that he functions academically "at a 4th to 6th grade school level." J.S.'s work at the tire shop consists of manual labor. That business is run by a family friend who allows J.S. to work there because, in J.S.'s words, "it's hard to get a real job" because he finds it "hard to function with other people and understand stuff."

In addition, Daryl told Hopkins that J.S. is "kind of mentally slow." Hopkins argues this statement did not inform him of J.S.'s condition. For support, he relies on *Garcia v. State*, in which the Court of Criminal Appeals held that a mother's

statement to the defendant that her daughter was intellectually disabled was not enough to show the defendant knew the daughter was incapable of consenting to sexual relations because the mother did not convey any details as to why her daughter was intellectually disabled or how she was affected by her intellectual disability. 661 S.W.2d 96, 98 (Tex. Crim. App. 1983). In this case, however, Daryl not only told Hopkins that J.S. was "kind of mentally slow," Daryl elaborated that this circumstance placed J.S. "sexually just off limits." In other words, Daryl explicitly told Hopkins that J.S.'s cognitive limitations made him an inappropriate choice as a sexual partner. Hopkins reportedly responded "okay."

Viewing all the evidence in the light most favorable to the verdict, we hold the evidence is legally sufficient to prove Hopkins knew J.S. had a mental disease or defect that made him incapable of appraising the nature of oral sex or resisting it.

## 2. Disability

Hopkins argues the evidence is legally insufficient to prove that J.S. is a "disabled individual" as required by the aggravated-sexual-assault statute. He maintains that to satisfy this statutory requirement, "the State must show that the victim was completely disabled within the meaning of the law." The State did not make this showing, Hopkins argues, because the evidence shows that J.S. was not intellectually disabled as that term is clinically understood. Hopkins maintains that

J.S. falls well outside the range of intellectual disability that Texas courts have recognized as qualifying a person as a "disabled individual."

For purposes of aggravated sexual assault, a person qualifies as a "disabled individual" if due to age or physical or mental disease, defect, or injury he is substantially unable to protect himself from harm or to provide food, shelter, or medical care for himself. PENAL § 22.021(b)(3). The statute uses the term "substantially," which means "to a great or significant extent" or "for the most part; essentially." NEW OXFORD AMERICAN DICTIONARY 1736 (3d ed. 2010). Thus, the disability need not be absolute or complete. *See id.*; *see, e.g.*, *Graves v. State*, 307 S.W.3d 483, 496–97 (Tex. App.—Texarkana 2010, pet. ref'd) (evidence of disabled-individual status sufficient despite proof that intellectually disabled victim was married, had children, and had been convicted of organized criminal activity).

Whether J.S. is intellectually disabled as a clinical matter is unclear. Dr. Costa testified that J.S.'s IQ test showed that he has a Full Scale IQ of 70. She characterized this score as "equivalent to a mild" intellectual disability or as being on its cusp. But Costa also indicated that J.S.'s test result was not definitive because it showed there was a 95 percent probability that his IQ falls somewhere in the range between 67 and 75. A score below 70 definitely reflects intellectual disability. Because of his "score of 70 and it possibly being lower than a 70," Costa concluded that J.S. had a mild intellectual impairment and that additional testing would be necessary to

determine the extent of the impairment. Thus, the record does not support Hopkins's assertion that J.S. is not intellectually disabled as a clinical matter.

At any rate, the aggravated-sexual-assault statute does not require a showing of intellectual disability as that term is clinically understood. *See* PENAL § 22.021(b)(3); *see also Young v. State*, No. 14-17-00902-CR, 2019 WL 1120125, at *4 (Tex. App.—Houston [14th Dist.] Mar. 12, 2019, no pet.) (mem. op., not designated for publication) (noting that Penal Code's term "disabled individual" is not synonymous with clinical diagnosis of intellectual disability). Evidence of the victim's IQ is not required. *See, e.g.*, *Rogers v. State*, No. 12-16-00228-CR, 2017 WL 1250837, at *2–3 (Tex. App.—Tyler Apr. 5, 2017, pet. ref'd) (mem. op., not designated for publication) (holding evidence of disabled-individual status sufficient in aggravated sexual assault prosecution in which jury heard evidence that autistic victim was functional and no evidence of her IQ was referenced); *Denstitt v. State*, No. 02-14-00172-CR, 2015 WL 4043285, at *1–2 (Tex. App.—Fort Worth July 2, 2015, no pet.) (mem. op., not designated for publication) (holding evidence of disabled-individual status sufficient based on forensic interviewer's testimony as to victim's behavior, victim's testimony, and victim's uncle's testimony); *Allen v. State*, No. 12-08-00349-CR, 2009 WL 1153401, at *4–5 (Tex. App.—Tyler Apr. 30, 2009, no pet.) (mem. op., not designated for publication) (holding evidence of disabled-person status sufficient despite "State's failure to present any IQ test score

or other objective evidence" of victim's "mental incapacity"). Nor is expert testimony of a psychologist or psychiatrist required to prove that a victim is a "disabled individual" within the meaning of the aggravated-sexual-assault statute. *Edwards v. State*, No. 03-12-00093-CR, 2014 WL 2521451, at *3 (Tex. App.—Austin May 29, 2014, pet. ref'd) (mem. op., not designated for publication).

Whether or not J.S. is intellectually disabled in the clinical sense, the record does contain evidence that J.S. is substantially unable to provide food and shelter for himself. Costa testified that people like J.S., who have borderline intellectual functioning, cannot live well independently because they require assistance due to their limited reasoning ability. Consistent with Costa's opinion, J.S. has never lived alone. Aside from the short time J.S. stayed with Daryl, J.S. has lived at home with his family his entire life. J.S.'s mother testified that he may be able to cook an egg or a piece of bacon but that someone usually oversees such cooking. J.S. does not prepare dinner. J.S. earns money from his job at the tire shop and receives some additional funds based on his status as an adult disabled person. But J.S. does not personally manage this income. His mother testified that J.S. instead allows her to use this money, and they "talk about what's going on" in terms of how it is spent. By J.S.'s own account, he would not have a job due to his cognitive limitations but for a family friend's willingness to hire him. Both J.S.'s mother and Daryl testified that J.S. lacks the ability to drive. Daryl likewise testified that J.S. lacks the capacity

29

to pay his own bills. Based on this evidence, the jury could have reasonably found J.S. was a "disabled individual" within the meaning of the aggravated-sexual-assault statute. *See Benton v. State*, 237 S.W.3d 400, 401–03 (Tex. App.—Waco 2007, pet. ref'd) (holding evidence, including parents' testimony that teenage victim could not care or provide for himself, sufficient to prove victim was disabled individual).

The record also contains evidence that J.S. is substantially unable to protect himself. J.S.'s mother stated that his job at the tire shop has made him stronger, and that she thought he had the physical strength to fend off unwanted advances. But the jury also heard evidence that J.S.'s cognitive limitations make him relatively defenseless. Notwithstanding J.S.'s physical strength, his mother stated that her son lacked the ability to understand someone might try to hurt or manipulate him sexually. Indeed, J.S. said he did not know how to defend himself from Hopkins's advances. Nor is J.S.'s defenselessness necessarily limited to sexual situations. Dr. Costa testified that J.S.'s cognitive limitations impair his judgment and inhibit quick decision-making:

> Q. When someone with [J.S.'s] diagnosis and intellectual impairment is in a moment where they're having to make a quick decision, how are they impacted by their intellectual functioning?
>
> A. He's going to have difficulties making a quick decision. He's going to need extra time to kind of make those sorts of decisions and his judgment is going to be impaired.
>
> Q. Is that why someone with [J.S.'s] intellectual functioning needs supervision?

A.  Correct.

The jury could have reasonably inferred from Costa's testimony that J.S. is generally incapable of the kind of rapid, decisive action that protecting oneself often requires. *See Fongang v. State*, No. 07-11-00358-CR, 2013 WL 5460002, at \*4 (Tex. App.—Amarillo Sept. 30, 2013, pet. ref'd) (mem. op., not designated for publication) (jury could have reasonably found that mildly intellectually disabled victim was substantially unable to protect herself based on psychologist's testimony that victim required extra protection due to her cognitive limitations).

Hopkins argues that J.S. nonetheless does not qualify as a "disabled individual" because J.S.'s cognitive limitations are less severe than victims found to be disabled individuals in other cases. Hopkins is correct that many other cases feature victims with more severe limitations. *See, e.g.*, *Sanchez*, 479 S.W.2d at 935, 941 (evidence showed that intellectually disabled teenage victim had almost no schooling, was not allowed outside home unsupervised, rarely spoke, and testified almost exclusively by nodding in affirmative or negative); *Bradford v. State*, 477 S.W.2d 544, 544–45 (Tex. Crim. App. 1972) (evidence showed teenage victim with intellectual capacity of infant could not walk, wore diapers, slobbered on herself, ate like infant, and could not talk). But the statutory definition of "disabled individual" does not require the severe cognitive limitations present in these other cases. *See* PENAL § 22.021(b)(3); *see also Fongang*, 2013 WL 5460002, at \*4–5 (evidence

31

sufficient to prove victim was disabled individual despite defendant's contention that victim was more capable than victims in other cases who had lower IQs and less ability to care for themselves). A victim may be much more functional in some respects and still qualify as a "disabled individual." *See, e.g.*, *Forkert v. State*, No. 11-16-00279-CR, 2018 WL 4840704, at *1, *8 (Tex. App.—Eastland Oct. 4, 2018, no pet.) (mem. op., not designated for publication) (evidence sufficient to prove victim in twenties with borderline intellectual functioning was disabled individual despite evidence that she graduated from high school in special education program and had held job as dishwasher); *Morgan v. State*, 365 S.W.3d 706, 708–09 (Tex. App.—Texarkana 2012, no pet.) (evidence sufficient to prove intellectually disabled victim in his twenties was disabled individual despite proof that he was able to ride bicycle and once had job at fast food restaurant).

Hopkins further argues that a conviction for aggravated sexual assault requires evidence of a more severe degree of mental disease or defect than is required to support a conviction for sexual assault and that the evidence is insufficient to show J.S. met this elevated standard. In support, Hopkins cites several Penal Code provisions, specifically sections 22.011(b)(4), 22.021(b)(3), and 22.021(c).

But the Penal Code refutes Hopkins's argument. Under the sexual-assault statute, an act is deemed nonconsensual if the defendant knew that the other person could not appraise the nature of the act or resist it due to mental disease or defect.

PENAL § 22.011(b)(4). These same circumstances make an act nonconsensual under the aggravated-sexual-assault statute. *Id.* § 22.021(c). In other words, both sexual assault and aggravated sexual assault apply the same understanding of mental disease or defect for purposes of consent. To qualify as an aggravated sexual assault, however, the State must prove one of several aggravating circumstances. *Id.* § 22.021(a)(2). One of these aggravating circumstances is that the victim is a disabled individual, which includes persons older than 13 years of age who are substantially unable to protect themselves from harm or to provide food, shelter, or medical care for themselves due to mental disease or defect. *Id.* § 22.021(a)(2)(C). While the definition of disabled individual concerns the effects of mental disease or defect just like the definition of consent, each definition requires different kinds of proof than the other one. Consent turns on the ability to understand the nature of the sex act and oppose it if it is undesired; disabled-individual status turns on an inability to protect oneself from harm or to provide for oneself to a significant extent. Thus, the distinction between aggravated sexual assault and sexual assault is not necessarily the severity of the mental disease or defect. *See Esparza v. State*, No. 04-10-00668-CR, 2011 WL 4828431, at *7–10 (Tex. App.—San Antonio Oct. 12, 2011, no pet.) (mem. op., not designated for publication) (defendant conceded victim was disabled individual but disputed she was incapable of consent).

Viewing all the evidence in the light most favorable to the verdict, we hold the evidence is legally sufficient to prove J.S. is a disabled individual.

## II.     Error in the Jury Charge

We review an alleged jury charge error regardless of preservation. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). Our review of jury charge error consists of a two-step process. *Id.* We first determine whether the challenged instruction is erroneous. *Id.* When we review a charge for error, we consider the charge as a whole rather than as a series of isolated and unrelated statements. *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012). If the charge is erroneous, we then analyze the error for harm. *Kirsch*, 357 S.W.3d at 649.

### A.     Assumption of disability

Hopkins argues the trial court erred in overruling his objection that the charge's application paragraph assumed J.S. is a disabled individual rather than requiring the jury to find that he is disabled. By failing to require this finding, Hopkins argues, the charge allowed the jury to convict him of aggravated sexual assault based on facts that at most could support a conviction for sexual assault.

The charge informed the jury that Hopkins stood "charged by indictment with the offense of aggravated sexual assault of a disabled person." It explained that consent is lacking if the "defendant knows that as a result of mental disease or defect the other person is at the time of the sexual assault incapable either of appraising the

34

nature of the act or of resisting it." It defined a "disabled person" as one "older than 13 years of age, who by reason of age or physical or mental disease, defect, or injury is substantially unable to protect the person's self from harm or to provide food, shelter or medical care for the person's self."

The application paragraph of the charge read as follows:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 15th day of May, 2016, in Harris County, Texas, the defendant, Steven Wallace Hopkins, did then and there unlawfully, intentionally or knowingly cause the sexual organ of [J.S.], a disabled person, to contact the mouth of the defendant, without the consent of [J.S.], namely the defendant knew that as a result of mental disease or defect that [J.S.] was, at the time of the sexual assault, incapable of appraising the nature of the act or resisting the act, then you must find the defendant guilty of aggravated sexual assault of a disabled person, as charged in the indictment.

The charge then instructed that if the jury did not so find beyond a reasonable doubt or had reasonable doubt, it had to acquit Hopkins.

We disagree that the charge assumed J.S. is a disabled individual. The charge defined the phrase "disabled person," and the application paragraph stated that the jury must find Hopkins guilty of aggravated sexual assault if it found beyond a reasonable doubt that he performed oral sex on J.S., a disabled person, without consent. Thus, the charge required the jury to find that J.S. is a disabled person, or a disabled individual, to find Hopkins guilty.

The application paragraph of the charge in this case is comparable to the charge given in *Woodard v. State*, 294 S.W.3d 605 (Tex. App.—Houston [1st Dist.]

35

2009, pet. ref'd). In *Woodard*, the defendant was indicted for aggravated robbery. *Id.* at 606. The indictment alleged several aggravating circumstances, one of which was that the defendant caused bodily injury to a victim who was 65 years of age or older. *Id.* at 606–07. The jury charge's application paragraph read as follows:

> Now . . . if you believe beyond a reasonable doubt that in Brazoria County, Texas[,] on or about the 25th of July, 2007, the defendant Vincent Goree Woodward, did then and there, acting alone or as a party as that term has been previously defined, while in the course of committing theft of property owned by T.B., and with intent to obtain or maintain control of said property, intentionally or knowingly or recklessly cause bodily injury to T.B., *a person 65 years of age or older*, by hitting T.B. with the defendant's hand[,] then you will find the defendant guilty of the offense of Aggravated Robbery as charged in the indictment.

*Id.* at 607–08 (emphasis added).

Structurally, the present charge mirrors the one given in *Woodard*. Both charges insert the alleged aggravating circumstance after the victim's name. In *Woodard*, the aggravating circumstance was the victim's age; in this case, the aggravating circumstance is the victim's status as a disabled individual. The charge in both cases required the jury to find these aggravating circumstances to reach a guilty verdict. *See also Acreman v. State*, No. 09-92-00189-CR, 1993 WL 338626, at *2 (Tex. App.—Beaumont Aug. 25, 1993, pet. ref'd) (not designated for publication) (similarly phrased aggravated robbery jury charge in which aggravating circumstance was victim's disabled-individual status given when defendant disputed that victim was disabled individual).

36

Admittedly, *Woodward* and *Acreman* are not directly on point, as the defendants in those cases did not assert the charge error that Hopkins does. But another court of appeals recently rejected the very argument Hopkins raises here. In *Romero v. State*, the defendant was charged with aggravated robbery. No. 04-17-00325-CR, 2018 WL 2323573, at *1 (Tex. App.—San Antonio May 23, 2018, no pet.) (mem. op., not designated for publication). The alleged aggravating circumstance was that his victim was a disabled individual. *Id.* The jury found the defendant guilty. *Id.* On appeal, he argued the charge erroneously instructed the jury that the victim was a disabled person. *Id.* He maintained that the charge "simply and explicitly labeled" his victim disabled. *Id.* at *2 (brackets omitted).

The abstract portion of the jury charge in *Romero* defined "disabled person" as "an individual with a mental, physical, or developmental disability who is substantially unable to protect himself from harm." *Id.* (based on definition in PENAL § 29.03(c)). The application paragraph then read:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 8th day of July, 2016, in Bexar County, Texas, the defendant, Gene Phillip Romero Jr., while in the course of committing theft of property and with intent to obtain or maintain control of said property, did intentionally, knowingly, or recklessly cause bodily injury to Kaitong Johnson, *a disabled person*, by striking Kaitong Johnson with the hand of Gene Phillip Romero Jr., then you will find the defendant guilty of aggravated robbery as charged in the indictment.

*Id.* (emphasis added; brackets omitted).

Based on the charge's language, the court of appeals rejected the defendant's claim that the charge assumed his victim was a disabled individual. *Id.* The court of appeals reasoned that the charge did not do so because in its application paragraph the word *if* preceded all the elements of the offense, and it instructed that the jury had to find beyond a reasonable doubt everything following that *if* to find the defendant guilty. *Id.* Thus, the court held that the application paragraph was consistent with the abstract portion of the charge requiring the jury to find the victim was a disabled individual. *See id.* (citing *Woodard*, 294 S.W.3d at 607–08; *Acreman*, 1993 WL 338626, at *2).

We agree with the *Romero* court and hold that the charge before us did not assume J.S. is a disabled individual rather than requiring the jury to find he is so as a prerequisite to a guilty verdict. Thus, the charge was not erroneous in this respect.

**B.      Presumption of non-consent**

Hopkins argues that the jury charge's application paragraph created an unconstitutional mandatory presumption that J.S. did not consent, thereby eliminating the State's burden to prove this element. He argues that this is so because the charge required the jury to find J.S. "could not legally consent to sexual relations" if it found that he had a "mental disability." Hopkins further argues that such a presumption that mentally disabled people cannot consent is unconstitutional.

38

A jury charge creates a mandatory presumption if it requires a jury to find an elemental fact based on proof of a predicate fact or requires the defendant to disprove the elemental fact once the predicate fact has been established. *Willis v. State*, 790 S.W.2d 307, 309 (Tex. Crim. App. 1990). Doing so is unconstitutional because it relieves the State of the burden of proving guilt beyond a reasonable doubt. *Id.* To avoid this constitutional infirmity, any such presumption included in a jury charge must be accompanied by the following additional instructions:

(A) that the facts giving rise to the presumption must be proven beyond a reasonable doubt;

(B) that if such facts are proven beyond a reasonable doubt the jury may find that the element of the offense sought to be presumed exists, but it is not bound to so find;

(C) that even though the jury may find the existence of such element, the state must prove beyond a reasonable doubt each of the other elements of the offense charged; and

(D) if the jury has a reasonable doubt as to the existence of a fact or facts giving rise to the presumption, the presumption fails and the jury shall not consider the presumption for any purpose.

PENAL § 2.05(a)(2). Without these additional instructions, which make the presumption non-mandatory, submission of the presumption is error. *Jimenez v. State*, 419 S.W.3d 706, 709 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd).

Hopkins did not object to the charge on the basis that it created or included a mandatory presumption at trial. His argument on appeal is less than clear.

To the extent Hopkins contends proof that J.S. is a "disabled individual" created a mandatory presumption of non-consent, we disagree. Disabled-individual status is an aggravating circumstance that elevated the offense from sexual assault to aggravated sexual assault. PENAL § 22.021(a)(2)(C). Whether J.S. is a "disabled individual" played no role in the jury's finding of non-consent. Instead, consistent with the sexual-assault and aggravated-sexual-assault statutes, the jury was instructed that consent was lacking if Hopkins knew that J.S. could not appraise the nature of oral sex or resist it as a result of mental disease or defect. *Id.* §§ 22.011(b)(4), 22.021(c). J.S.'s status as a "disabled individual" thus did not create any sort of presumption, mandatory or otherwise, with respect to consent.

To the extent Hopkins contends proof of any mental disease or defect created a mandatory presumption of non-consent, we again disagree. The charge did not instruct the jury that J.S. did not or could not consent if he has a mental disease or defect. Instead, consistent with the Penal Code, the charge instructed that the sex act was nonconsensual only if Hopkins knew that J.S. could not appraise the nature of the act or resist it as a result of mental disease or defect. *Id.* § 22.011(b)(4). Evidence of mental disease or defect, standing alone, could not result in conviction. *Id.* Mere proof of mental disease or defect thus did not create any presumption.

To the extent Hopkins contends that proof he knew J.S.'s mental defect deprived J.S. of the ability to appraise or resist sex created a mandatory presumption

of non-consent, his contention presents a more colorable question. In *Jimenez*, our court held that another sexual-assault provision, one providing that consent is lacking when the defendant is employed by the facility where a person to whom he is not wed resides, creates an unconstitutional mandatory presumption unless the jury charge includes the additional instructions set forth in section 2.05(a)(2). 419 S.W.3d at 716–18 (construing PENAL § 22.011(b)(11)). The same arguably could be said of the consent provision before us.

But the provision before us also significantly differs from the provision at issue in *Jimenez*. The provision at issue in *Jimenez* provides that consent is lacking based on facts about employment, residency, and matrimonial status that ordinarily do not bear a definitive relationship to or bar the possibility of actual consent. PENAL § 22.011(b)(11). In contrast, the provision before us deems sex nonconsensual based on the victim's inability to understand the nature of the act or decline participation and the defendant's awareness of the victim's inability to do so. PENAL § 22.011(b)(4). In other words, consent is lacking because the victim is incapable of either giving or withholding actual consent. *See Rider*, 735 S.W.2d at 293. It is not so much that the law presumes non-consent under these circumstances as it is that these circumstances render actual consent an irrelevancy. *See id.*

Indeed, in *Jimenez*, our court indicated that the consent provision before us materially differed from the one at issue in that case. Though in *Jimenez* we held

that the trial court erred in instructing the jury that consent was lacking upon proof in conformity with section 22.011(b)(11) in the absence of the instructions required by section 2.05(a)(2), we ruled that the error was harmless. 419 S.W.3d at 718–19. We did so in part based on the fact that multiple theories of non-consent were submitted to the jury. *Id.* at 718. One of these other theories of non-consent was that the defendant knew the victim was incapable of appraising the nature of the act or resisting it due to mental disease or defect. *Id.* Because we were convinced that the jury in *Jimenez* could have convicted under this theory, rather than relying on section 22.011(b)(11)'s presumption, we held that the trial court's failure to instruct the jury under section 2.05(a)(2) did not constitute reversible error. *Id.* at 718–19. We could not have held so in *Jimenez* if section 22.011(b)(4) also created a mandatory presumption requiring a section 2.05(a)(2) instruction.

We thus hold that section 22.011(b)(4) is not a mandatory presumption. Ergo, the trial court did not err in not instructing the jury under section 2.05(a)(2).

We also reject Hopkins's contention that his conviction rests on an unconstitutional rule of law that the intellectually disabled categorically cannot consent to sexual relations. To the extent he relies on *Lawrence v. Texas*, we note that the consensual nature of the sexual relations in that case was undisputed. 539 U.S. 558, 578 (2003). *Lawrence* therefore is inapposite. *See Grabowski v. State*, No. 04-15-00699-CR, 2016 WL 6473066, at *3 (Tex. App.—San Antonio Nov. 2, 2016,

42

pet. ref'd) (mem. op., not designated for publication) (holding defendant's reliance on *Lawrence* was misplaced in aggravated-sexual-assault prosecution premised on victim's inability to consent due to mental disease or defect). We discern no unconstitutionality in section 22.011(b)(4), which renders sex nonconsensual only if the defendant knows that his victim cannot appraise the nature of the act or resist it due to mental disease or defect. *See Painter v. State*, No. 11-15-00318-CR, 2017 WL 6559653, at \*3–5 (Tex. App.—Eastland Dec. 21, 2017, pet. ref'd) (mem. op., not designated for publication) (upholding statute against equal-protection and due-process challenges).

## CONCLUSION

We affirm the trial court's judgment.

Gordon Goodman
Justice

Panel consists of Justices Kelly, Goodman, and Countiss.

Publish. TEX. R. APP. P. 47.2(b).